THE FIRST NATIONAL BANK OF LAKE FOREST, as Successor Admr. of the Estate of LOUIS I. TELPNER, Appellant, *v.* CHICAGO NATIONAL LIFE INSURANCE COMPANY, Appellee.

(No. 71-10;

Second District—February 9, 1972.

Barclay, Damisch & Sinson, of Chicago, (Loretta C. Didzerekis, of counsel,) for appellant.

Petit, Safeblade, Littlejohn & Glass, of Chicago, for appellee.

Mr. JUSTICE GUILD delivered the opinion of the court:

This is a companion case in many respects with *Koretz v. All American Life & Cas. Co.* (1968), 102 Ill.App.2d 197, 243 N.E.2d 586, and attention is directed to the opinion of this court there sitting in the First District.

The Chicago National Life Insurance Company in November of 1962 issued a prospectus for the sale of 100,000 shares of its common stock at $4 a share. This apparently was not a general offer but an offer to select Illinois residents who would promote the growth and development of the company.

A copy of the prospectus was sent to Louis Telpner on November 30th, 1962, with a covering letter from one Richard T. Christoph, Regional Sales Director for Chicago National, who was also a shareholder of Chicago Management Corporation, a company owning 87% of the Chicago National Life Insurance Company stock. On December 4, 1962, Louis Telpner executed a subscription agreement for 3750 shares at $4 a share and forwarded his check and the subscription depository agreement to the Chicago National Life Insurance Company. The stock subscription and depository agreement reads in part as follows:

"To: Chicago National Life Insurance Company

The undersigned hereby *accepts the offer* of Chicago National Life Insurance Company as set forth in its prospectus dated November 1, 1962, and acknowledges receipt of a copy of said prospectus and subscribes for *3,750 shares* of stock at $4.00 per share in Chicago National Life Insurance Company, of Chicago, Illinois, par value $1.00 per share, and herewith attaches payment in the sum of Fifteen Thousand Dollars ($15,000) as payment in full upon the following terms:  *  *  *."

Other pertinent parts of the Subscription Agreement are as follows:

"Upon receipt of this Agreement  *  *  *  the Company will acknowledge said receipt within fifteen (15) days from the date hereof, and issue its Interim Receipt to the subscriber, subject to provisions of paragraph five (5) hereof."

Paragraph four, in part, added:

"Deposit of the funds paid in by the subscriber into the Company's

Escrow Account shall constitute acceptance of this agreement by the Company."

and paragraph five partially provided:

"* * * Company shall have the right, at its discretion, at the home office, until delivery of the Interim Receipt, to reject any subscription by returning to the subscriber the payment tendered with this subscription."

About a month later on January 3rd, 1963, Allen Dowling, President of Chicago National acknowledged receipt of Telpner's subscription and check for $15,000. Dowling, like Christoph, was a major shareholder in Chicago National Life Insurance Company, as well as being President of the Chicago Management Company, in substance, the holding company.

Another subscription agreement dated April 1, 1963, was executed by Louis Telpner for 1250 shares of Chicago National Life Insurance Company stock for a total cost of $5,000 at $4 a share. Dowling in his dual capacity as President of Chicago Management Company and Chicago National Life altered the date of this subscription agreement to April 21st, 1963. Telpner then sent his check dated April 30th, 1963, for the aforementioned $5,000 payable this time to Chicago Management Corporation for the Chicago National Life Insurance Company stock.

On April 17, 1963, Dowling returned Telpner's check for $15,000 and the subscription agreement. Telpner never received the 3,750 shares under his subscription of December 4th, 1962. Telpner died on December 21st, 1963.

In this connection reference is made to *Koretz, supra,* where it is to be noted that Telpner had introduced one Allan R. Koretz to Christoph in November of 1962. Koretz subscribed for 1,000 shares at $4 a share. Subsequently, Koretz's check was returned to Telpner and Christoph in the *Koretz* case testified that he would let Koretz subscribe for 100 shares of Chicago National stock at $4 a share "to settle any differences." In this regard the instant case differs from this point forward. In *Koretz* the court held that there was an accord and satisfaction. It is to be noted that an interim receipt was issued to Telpner and that the subscription monies for the stock were not deposited with the Northern Trust Company as escrow agent until some time in April, 1963. It is the contention of Chicago National that there was no acceptance of the subscription agreement until the funds were deposited in the escrow account. This is based on paragraph 4 of the subscription agreement above which reads:

"Deposit of the funds paid in by the subscriber into the Company's Escrow Account shall constitute acceptance of this agreement by the Company."

It can thus be seen that this paragraph would give the company control of the issuance of the stock to anyone they desired up until the time they deposited the funds with the escrow agent. It is undisputed that the stock at the time of the issuance thereof had a value of approximately $8 to $17 a share rather than the issuing price of $4 a share. The stock was over-subscribed and it appears that Christoph, Dowling, and one Freeman Wood, received the majority of the shares issued in conformance with the prospectus. The proof adduced in the trial court from this point on differs substantially from that presented in the *Koretz* case. Three of the witnesses who testified in the instant case were Freeman Wood, Richard Christoph and Allen Dowling, at one time all major stockholders, Christoph and Dowling being directors in the defendant insurance company. Prior to the institution of this suit, the Chicago Management Company apparently owned 87% of the Chicago National Life Insurance Company stock. Wood was an incorporator of Chicago Management and exchanged his 50,000 shares of Chicago Management for 12,500 shares of the Chicago National when the two companies merged. In 1966 the shares of Chicago National Life Insurance Company in another merger were exchanged for stock in All American Life and Casualty Company. Richard Christoph was a major shareholder in Chicago Management, was a director and regional sales manager of Chicago National Life Insurance Company, and he in turn purchased $50,000 worth of stock in Chicago National. Allen Dowling also was a director of Chicago National and was not only president of Chicago Management but was the controlling shareholder of the Chicago National Life.

Prior to trial herein apparently all of the stock had been transferred so that at the time of the trial Chicago National Life Insurance Company had been merged with All American Life & Casualty Company.

The primary issue before this court is whether or not the testimony of Wood, Christoph and Dowling, is admissible under the provisions of the Dead Man's Act, (Ill. Rev. Stat. 1969, ch. 51, par. a 2). The trial court held that these three witnesses were competent to testify as to conversations with Telpner who was deceased because they held no shares in the defendant company at the time of their testimony. We will consider the testimony of the three witnesses separately.

The only testimony of Freeman Wood that bears upon the issues of this case was as follows:

"*    *    *    Mr. Telpner said he was unhappy because he was unable to get shares in the Chicago National Life Insurance Company and that he was consulting a lawyer and I suggested that perhaps it could be corrected by getting in touch with the President, Mr. Dowling.

That was the entire conversation, as I recall it. I phoned Mr. Dowling afterwards."

Richard Christoph testified that at the time of the suit herein he had traded his Chicago National stock for All American stock and at the time of the trial he held no stock in All American Life & Casualty or Chicago National; that he had had no stock in either company for about two years. Christoph then went on to testify that he had a conversation with Mr. Telpner prior to April 9th relative to Telpner's $15,000 subscription and some discussion of Telpner's activities with two other insurance companies. He then testified he had two telephone conversations with Telpner with relation to the return of the $15,000 and the issuance of the 1,250 shares of Chicago National Life. Christoph introduced no testimony relative to the precise issue involved here. Once again, Christoph testified similarly to Wood, as follows:

"* * * and that Dowling had returned the subscription and the check to him and he said he was telling Freeman Wood this and he was considering consulting a lawyer to see if he had any legal right to this subscription. He said he mentioned it to—well, you do what you want, he said he was talking to Freeman Wood and Freeman Wood was going to talk to Dowling to see if he could work anything out. I was out of it."

It can thus be seen that no testimony of Wood or Christoph was in fact contrary to the interest of Telpner or to the possible contentions of the plaintiff herein. As a matter of fact, the testimony of these two witnesses, if anything, was beneficial to the plaintiff.

The witness Dowling testified over the strenuous objection of the plaintiff that in a conversation with Telpner he said:

"in order to settle this matter I will get you 1,250 shares of the stock for this next subscription * * * you give me a check for it and we will reinstate your ownership in this company and we will settle this entire matter. Is that all right with you?"

In response to further inquiry the witness stated:

"Mr. Telpner said, that's wonderful with me. I appreciate your considering it. I am determined to get rid of this Mayflower situation and you will see that I will produce."

It is of course the contention of the defendant that the issuance of the 1,250 shares of stock was thus an accord and satisfaction for the withdrawal offer of the 3,750 shares. At the time of his testimony Dowling was not a shareholder in American Life & Casualty or Chicago National.

There is no contention by the plaintiff herein that the above three witnesses disposed of their shares for the purpose of testifying in this

suit. The question then presented to us is whether or not directors or shareholders who have disposed of their holdings in a corporation in the ordinary course of business are barred from testifying under the Dead Man's Act?

This court fails to see how these three witnesses have a direct interest in the outcome of this lawsuit so that their testimony is barred under Section 2 of the Illinois Evidence Act. As indicated above the testimony of two of the witnesses, if anything, was beneficial to the theory of the plaintiff. The trial court held that there was in fact an accord and satisfaction by Telpner in the acceptance of the 1,250 shares in lieu of the original subscription for 3,750 shares under his original subscription agreement.

■■ We therefore find that the testimony of the witnesses, all of whom had divested themselves of any interest in the defendant corporation or its successor by merger were not barred by Section 2 of the Evidence Act and that their testimony was therefore proper under the circumstances.

■■ We further find that the decedent herein, Louis Telpner, by his acceptance of 1,250 shares did in fact enter into an accord and satisfaction with the defendant. This is particularly true in view of the fact that there was a controversy existing between Telpner, and Christoph, Wood and Dowling, for all practical purposes the incorporators of the new Chicago National Life Insurance Company. It would be strange indeed to accept the theory of the plaintiff herein that after such a controversy involving the 3,750 shares that the corporation or the parties involved would then issue an additional 1,250 shares notwithstanding the disagreement that they had had.

Judgment affirmed.

MORAN, P. J., and ABRAHAMSON, J., concur.